**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

ANTHONY EDWARDS and MARVIN
MINNEY, JR.,

        Plaintiffs,

    v.

WELLS FARGO BANK NATIONAL
ASSOCIATION et al.,

        Defendants.

No. 1:19-cv-14409-NLH-SAK

**OPINION**

**HILLMAN**, District Judge

    This matter comes before the Court on an Order to Show Cause for why counsel Joshua Louis Thomas should not be sanctioned for his conduct in filing this lawsuit and referred to the Chief Judge of this District for consideration as to further disciplinary action.[1]  For the reasons set forth below, the Court will sanction Thomas $5,000.00 under Federal Rule of Civil Procedure 11 and refer him to the Chief Judge for further disciplinary proceedings consistent with our Local Civil Rule 104.1(e).

---

[1] The Court notes that the Three-Member Panel of the Disciplinary Board recommended, and the Supreme Court of Pennsylvania granted, the Joint Petition in Support of Discipline on Consent which suspended Thomas from the Pennsylvania Bar for two years as of October 1, 2021.  Office of Disciplinary Counsel v. Joshua Louis Thomas, No. 2822, 2021 Pa. LEXIS 3722 (Pa. Nov. 19, 2021); prior history No. 115 DB 2021, Attorney Registration No. 312476 (Delaware County).

## PROCEDURAL BACKGROUND

On June 27, 2019, counsel Joshua Thomas filed the Complaint in this action on behalf of Anthony Edwards and Marvin Minney, Jr. (ECF No. 1).  The Complaint is seventy-five pages long, and alleges nineteen separate counts against nine different defendants, all relating to a dispute over the foreclosure and sale of real property in Burlington, New Jersey.  As at least one court has noted, Thomas' modus operandi is to file a lengthy boiler plate complaint presenting convoluted, disjointed and disproven conspiracy theories about the manner in which mortgages are originated, recorded and serviced with a goal of complicating and forestalling the residential real estate foreclosure process.  His motive is financial.  In exchange for delaying the foreclosure and eviction process through his frivolous pleadings, he convinces the mortgagor, or in some cases a tenant, to pay him the mortgage or rental payment rather than the mortgagee.

Consistent with lulling his "clients" into making payments to him and seeking delay for the sake of delay, although summonses were issued, Thomas took no further action in this action until the Court put out a Notice of Call for Dismissal pursuant to Local Civil Rule 41.1(a) on December 9, 2019, (ECF No. 3).  Thomas then, on December 19, 2019, filed a motion seeking an extension of time to amend the Complaint and serve

2

the defendants, (ECF No. 4), which was granted by the Court on December 31, 2019.  (ECF No. 5).

Then on January 29, 2020, the Court received a letter from Plaintiff Anthony Edwards.  (ECF No. 6).  The letter stated that Edwards had only recently learned of this action, that the filing of the Complaint in his name "has not been approved[,]" that he had never met or spoken with Thomas, and that he never authorized Thomas to represent him in this action or in any other manner.  Id.  That same day, the Court issued an Order to Show Cause, which stated that "such accusations are serious in nature" and "would violate applicable Rules of Professional Conduct, the Local Civil Rules, and other binding authority," and gave Thomas fifteen days to show cause "as to why this matter should not be referred to the Chief Judge for consideration as to the appropriateness of disciplinary action pursuant to Local Civil Rule 104.1(e)."  (ECF No. 7).

Thomas filed a response to the Order to Show Cause on February 13, (ECF No. 8), and the Court thereafter scheduled a hearing to address the matter for March 17, 2020.  (ECF No. 9). The Court then agreed to a request for an adjournment made by Thomas and adjourned the hearing until April 7, 2020.  However, by that point in time, the COVID-19 pandemic had forced the cancellation or postponement of most non-emergency in-person Court proceedings.  Given the seriousness of the accusations

3

made against Thomas here, the Court decided that it was
necessary to hear from both him and Anthony Edwards in person
before reaching a decision regarding whether to impose
sanctions.  Accordingly, the hearing was adjourned several more
times, until in-person civil proceedings resumed.

The Court held a hearing on the Order to Show Cause on July
7, 2021, with both Thomas and Edwards in appearance.  (ECF No.
29).  At that hearing, Thomas requested the opportunity to file
an additional explanation as to why his decision to initiate
this action in Edwards' name was appropriate and not a violation
of any rules or ethical duties.

The Court therefore issued a second Order to Show Cause on
July 8, 2021, (ECF No. 30), which raised the specific
possibility of sanctions under Rule 11 of the Federal Rules of
Civil Procedure and the Rules of Professional Conduct and gave
Thomas fourteen days to file a supplemental response.  Thomas
then requested, and received, two extensions on that deadline,
and finally filed his response on September 3, 2021.  (ECF No.
37).

## DISCUSSION

The central issue to be addressed in this Opinion is not
whether Joshua Thomas engaged in egregious misconduct.  There is
one vital fact that is fully acknowledged by all parties here:
Joshua Thomas was not hired by Anthony Edwards to represent him

as counsel or authorized to file this lawsuit in his name, and the two had in fact never met prior to the July 7, 2021 Order to Show Cause hearing.  The only questions before the Court today then are: (1) exactly which rules and ethical duties has Joshua Thomas violated, and (2) how should he be sanctioned for his decision to file this lawsuit in Edwards' name and the actions he has since taken in defending himself before this Court?

Before answering those questions, however, the Court will recount the convoluted chain of events that led to this point and the specific misconduct engaged in by Thomas here.  The fact that Thomas filed a lawsuit on behalf of a plaintiff he had never met or been hired by is, in and of itself, unquestionably sufficient to impose serious sanctions.

However, as the Court anticipates further disciplinary bodies will likely review this Opinion in their own investigations into Thomas' conduct, and as Thomas' violations of the ethical and legal duties imposed on attorneys in this matter stretch beyond that initial act of misconduct, the Court believes it is useful to provide a brief outline of the factual background of this lawsuit.  The Court will then address the relevant duties and ethical requirements imposed on attorneys and assess exactly which sanctions are warranted here.

A. Factual Background[2]

In 2013, Anthony Edwards, under encouragement from two friends, Marvin Minney, Jr. and William Barksdale, purchased a home located at 37 LaClede Drive in Burlington, New Jersey and executed a mortgage on that property.  See (Complaint, ECF No. 1 at 18, ¶ 24; Transcript of July 7th Hearing, ECF No. 38 at 6:3-9:17).  Based on Edwards' own testimony and the representations of Thomas, it appears that this was, for the most part, the end of his involvement with the property: Edwards states that he never lived in the property, (ECF No. 38 at 4:24-5:7), and never made any of the monthly payments on the mortgage, id. at 9:14-9:21, and Thomas appears to have agreed with these assertions.[3]

---

[2] The Court notes here that some of the factual circumstances of the dispute underlying this action are less clear than may be desired, given Thomas' frustratingly opaque and confusing explanation of his own actions, Edwards' apparent lack of knowledge or awareness as to what had been happening over the years regarding the property he owned, and the fact that it also involves two separate state chancery court actions.  The Court has done its best to piece together what it believes to be as accurate a summary of the relevant facts as possible at this stage based on the testimony and filings of Thomas and Edwards, its detailed review of the state court dockets and transcripts that Thomas has filed in his defense, and those factual allegations found in the Complaint that have at least been supported by those other sources.

[3] While the Court credits Edwards for bringing the true history of this case to light, this underlying conduct regarding the mortgage strongly suggests Edwards was a straw purchaser for Minney, William Barksdale or perhaps someone else.  See (ECF No. 6 at 1) (Edwards describing being "frauded" by Barksdale).  On December 9, 2011, Barksdale pled guilty to one count of wire fraud conspiracy admitting that he conspired with Marvin Minney,

Instead, Minney moved into the home located on the property shortly after it was purchased, made a series of physical changes to the home, and took over the responsibility of making the mortgage payments. (See ECF No. 38 at 9:19-10:8 and ECF No. 37 at 1-2).

At some point in 2015, Minney apparently ran into financial difficulties and was unable to continue making the monthly

---

Jr. and others to fraudulently open numerous lines of credit on various homes in New Jersey owned by Minney and others. United States v. William Barksdale, Crim. No. 11-841, ECF No. 13 at 23-24. Barksdale was initially sentenced to 20 months in prison and five years of supervised release on February 21, 2014, id. at ECF No. 18, later reduced to time served. Id. at ECF No. 40. However, Barksdale was later convicted of violating the terms of his supervised release, including the restriction that he was not to engage in any way in the real estate profession, and was sentenced to an additional term of imprisonment of 30 months on June 30, 2022. Id. at ECF No. 99. The charges in the Third Amended Petition for Violation of Supervised Release alleged that Barksdale was engaged "in multiple real estate schemes, 'straw purchaser schemes', 'rescue scams', and real estate fraud related to quit claim deeds for $1.00." Id. at ECF No. 84, p. 3. The same pleading also recited an admission by Barksdale that he was "helping" his "friend" Marvin Minney regarding the real estate at issue in this case during the time this matter was pending in this Court and while Thomas purported to represent Minney. Id. This is consistent with Edwards' description in this matter of Barksdale being involved in "flipping houses," prior to Edwards becoming involved in the instant case, as well as the timing of Barksdale being "in trouble" and "ha[ving] to go away for a little bit," and his later reappearance to "relieve" Edwards of the house at issue here. Docket No. 19-cv-14409 at ECF No. 38, pp. 12, lines 4-19 and 13, lines 7-22. It seems inconceivable that Thomas, who admits to interacting with Barksdale during the pendency of is matter, was not aware of Barksdale's conviction and ban from participating in the business of real estate. If he did not know he was either willfully blind or failed to engage in the kind of due diligence required prior to the filing of this case.

mortgage payments.  Then, on December 6, 2016, Wells Fargo Bank, NA, the apparent holder of the mortgage on the property, filed a foreclosure action against Edwards in the Superior Court of New Jersey, Chancery Division.  Wells Fargo Bank, NA v. Edwards, Case No. F-032559-16, at Docket No. 2016183988 (N.J. Ch. Div. 2016).  The foreclosure action went forward uncontested, and Final Judgment for Foreclosure was entered in Wells Fargo's favor on April 12, 2017.  Id. at Docket No. 2017305495.

After the final judgment of foreclosure was entered, a sheriff's sale was initially scheduled for July 6, 2017.  While the specific chain of events around this time frame is somewhat unclear, the state chancery court later found that on June 8, 2017, Edwards apparently conveyed the property to Minney and Essie Cade.  Id., Docket No. 2019161523 at 3.  At the July 7, 2021 Order to Show Cause hearing, Edwards confirmed to this Court that he had met with Barksdale in 2017 and signed over his interest in the property.  (ECF No. 38 at 13:7-14:25).  Minney and Cade then filed multiple bankruptcies, which delayed the sheriff's sale for nearly two years.  The sheriff's sale was finally held on March 14, 2019, and the property was sold to a third-party bidder.  Id., Docket No. 2019161523 at 3.

At this point, nearly two years after the final judgment of foreclosure had been entered, Joshua Thomas, who represented Cade and Minney in another foreclosure matter, came onto the

scene.  On March 22, 2019, eight days after the property had
already been sold, Thomas filed a "Motion to Set Aside Sheriff's
Sale" in the original foreclosure action.  Id. at Docket No.
2019127187.  That motion attached an unsigned and unnamed
certification, which now appears to have been from Minney,
claiming that he had been in the process of purchasing the
property and therefore the sheriff's sale should not have gone
forward.  Thomas did not file any notice of appearance in that
action, making it unclear who exactly his client was at the
time.  The chancery court denied the motion on April 12, 2019.
Id. at Docket No. 2019161523.

In her order denying the motion, Judge Fiamingo referred to
Thomas as "attorney for Defendant Anthony Edwards," but in the
accompanying opinion specifically noted the manner in which
Thomas had obscured exactly who his client was: "Counsel does
not identify his client by name, nor has he filed any
appearance.  Thus, [the Court] does not know if counsel
represents defendant, Anthony Edwards, or one or both of the
transferees."  Id. at 2-3.  As Thomas has since admitted to the
Court, Thomas had been only retained by Minney to represent his
interests in the property, which Minney was apparently
attempting to purchase so that he could avoid being ejected from
the home and could continue to live there as he had for several
years.

9

After the motion to set aside the sale in the foreclosure action was denied by the state chancery court, Thomas then proceeded to file the present Complaint before this Court on June 27, 2019.  (ECF No. 1).  As described above, the Complaint here is seventy-five pages long, contains nineteen separate counts, and seeks over $145 million in damages and an order declaring Edwards' original mortgage void and Minney the rightful owner of the property, effectively overruling the state court's judgment in the foreclosure action.  See (Complaint, ECF No. 1 at 73-74).  Most importantly here though, the Complaint is filed in the names of both Anthony Edwards and Marvin Minney, Jr., even though Thomas has repeatedly conceded that Edwards had never retained him as counsel.  Thomas, admitting that he had never actually met or spoken to Edwards prior to filing the Complaint, instead claimed at the July 7, 2021 Order to Show Cause hearing that Barksdale had forwarded him an email from Minney, in which Minney claimed that he had "explained the lawsuit to Tone and got him onboard with Josh" Thomas filing the lawsuit.  "Tone" is apparently a nickname for Edwards.  (ECF No. 38 at 29:11-24; see also id. at 30:5-16).[4]

---

[4] Even if such a communication of agreement from Edwards, through Minney and Barksdale, to Thomas occurred, Thomas seems to be oblivious to the obvious conflict between representing Minney, the purported purchaser of the property and Edwards, the purported seller.

Three days after Thomas filed this apparently preemptive lawsuit, GBG Properties LLC, which the Court presumes is the party that purchased the property in question at the sheriff's sale, filed an ejectment action in the same state chancery court seeking an Order for a Writ of Possession and directing the county sheriff to remove any inhabitants from the property.  GBG Properties LLC v. Anthony Edwards et al., Case No. Bur-DC-5350-19 (N.J. Ch. Div. 2019).  Thomas, despite having never been retained by Edwards, filed a Notice of Appearance in this action stating that "I, the undersigned attorney, hereby enter my appearance as counsel on behalf of Anthony Edwards and Marvin Minney."  Id. at Docket No. 20191760704.

Judge Fiamingo, overseeing this second chancery court action as well, held a hearing on August 23, 2019 and then entered judgment in favor of the plaintiff, granting GBG Properties immediate possession and directing any inhabitants — in this case apparently Minney — to vacate the premises.  Id. at Docket No. 20191983793.  Thomas then filed a motion to stay that judgment.  After another hearing held on September 12, 2019, the state chancery court denied the motion for a stay, effectively ending that second action.

Nothing more appears to have happened in this dispute until January of 2020, as Thomas failed to serve any of the named defendants in the present action before this Court.  Around that

11

time, Edwards says he first learned of this action from Minney's brother, who informed him that a lawsuit had been filed in his name against Wells Fargo and other defendants. See (ECF No. 38 at 22:3-13). It was at this point, having finally learned about this lawsuit, that Edwards filed the above-quoted letter to this Court which led to the July 7, 2021 Order to Show Cause hearing and this Opinion.

B. Joshua Thomas Violated Fed. R. Civ. P. 11

With the relevant facts outlined, the Court will turn to its consideration of which specific rules Thomas violated in this case. While there may also be other sources of ethical duties imposed on attorneys that Thomas has violated, this Opinion will focus on Federal Rule of Civil Procedure 11 and the Rules of Professional Conduct, the specific bases for sanctions that the Court noted in its second Order to Show Cause. The Court will begin its analysis of Thomas' conduct with Rule 11.

Rule 11(b) provides that:

By presenting to the court a pleading, written motion, or other paper — whether by signing, filing, submitting, or later advocating it — an attorney . . . certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

    (1)   it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

    (2)   the claims, defenses, and other legal

contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; [and]

(3)   the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery[.]

Id.

Rule 11(c) further states that if a court "determines that Rule 11(b) has been violated" after issuing an Order to Show Cause for why conduct has not violated Rule 11(b), the court may, on its own initiative, "impose an appropriate sanction on any attorney . . . that violated the rule or is responsible for the violation."  In the case of sanctions imposed *sua sponte* under Rule 11(c)(3), "[t]he party sought to be sanctioned is entitled to particularized notice including, at a minimum, 1) the fact that Rule 11 sanctions are under consideration, 2) the reasons why sanctions are under consideration, and 3) the form of sanctions under consideration."  Simmerman v. Corino, 27 F.3d 58, 64 (3d Cir. 1994).

There is no question that Thomas has been given more than adequate notice of the potential sanctions he faced in this action.  The Court has issued two Orders to Show Cause for why he should not be sanctioned and held a hearing on this exact

question.  (ECF Nos. 7, 29, 30).  The first Order explicitly referenced the fact that the Court was considering referring him to the Chief Judge for further disciplinary proceedings.  (ECF No. 7).  The second Order to Show Cause went even further: it specifically referenced the possibility of imposing sanctions under Rule 11, directly stated that the Court was considering imposing sanctions on Thomas "for his actions in filing this complaint on behalf of Mr. Edwards and putting forth factual assertions regarding Mr. Edwards's conduct, without having ever met or spoken with Mr. Edwards prior to the filing of the complaint," and clearly described the possibility of referring Thomas for further disciplinary proceedings.  (ECF No. 30).

And the Court further made the stakes abundantly clear to Mr. Thomas in person during the July 7, 2021 Order to Show Cause hearing on the initial Order to Show Cause.  At that hearing, the Court stated on the record that while Thomas would be granted one last opportunity to address his actions and explain why he believed he should not be sanctioned in writing, the Court "intend[ed] to refer this [matter] to state disciplinary authorities for further investigation" and "to sanction [Thomas] monetarily."  (ECF No. 38 at 38:21-25 and 41:11-15).

The question then is simply whether Thomas' actions constitute violations of Rule 11.  In the Third Circuit, courts assessing whether to impose sanctions under Rule 11 must apply

14

an objective standard of "reasonableness under the
circumstances." Ford Motor Co. v. Summit Motor Prods. Inc., 930
F.2d 277, 289 (3d Cir. 1991).  Reasonableness in the context of
a Rule 11 inquiry has been defined as "an objective knowledge or
belief at the time of the filing of a challenged paper that the
claim was well grounded in law and fact." Id.  "[T]he central
purpose of Rule 11 is to deter baseless filings in District
Court and thus, consistent with the Rule Enabling Act's grant of
authority, streamline the administration and procedure of the
federal courts." Cooter & Gell v. Hartmarx Corp., 496 U.S. 384,
393 (1990); Reardon v. Murphy, Civ. A. No. 1811372, 2019 WL
4727940, at *4 (D.N.J. Sept. 27, 2019).

        Put more simply, as this Court and many others have
previously explained to Thomas on more than one occasion, Rule
11 is intended to discourage the filing of unsupported or
frivolous claims by "impos[ing] on counsel a duty to look before
leaping and may be seen as a litigation version of the familiar
railroad crossing admonition to 'stop, look, and listen.'"
Keyes v. Nationstar Mortgage, LLC, No. 1:20-cv-02649, 2020 WL
6111036, at *10 (D.N.J. Oct. 16, 2020) (quoting Lieb v. Topstone
Indus. Inc., 788 F.2d 151, 157 (3d Cir. 1986)).  Importantly, as
a finding of bad faith is not required for a Rule 11 violation,
see Martin v. Brown, 63 F.3d 1252, 1264 (3d Cir. 1995), there
can be no "empty head, pure heart" justification for the filing

of frivolous claims.  See Leuallen v. Borough of Paulsboro, 180 F. Supp. 2d 615, 618 (D.N.J. 2002) (quoting Fed. R. Civ. P. 11 Advisory Committee Notes (1993 amendment)).

The Court's focus here is on Rules 11(b)(3) and 11(b)(1). Under Rule 11(b)(3), Thomas, in filing the Complaint in this action, "certif[ied] that to the best of [his] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," the factual assertions found in the Complaint either had evidentiary support or would "likely have evidentiary support after a reasonable opportunity for further investigation or discovery."  Under Rule 11(b)(1), Thomas certified that the Complaint in this action was "not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation."

The straightforward questions here then are whether Mr. Thomas had an objectively reasonable basis, after having conducted an inquiry reasonable under the circumstances, to file the Complaint in this action and assert the factual allegations found in the Complaint, in essence whether Thomas had a proper purpose for filing this lawsuit.

The singular answer is even more straightforward: no. First, Thomas did not have, and could not have had, any factual basis whatsoever to file this lawsuit and assert the factual

16

allegations he put forth on behalf of Anthony Edwards, because
he had never met or spoken to Edwards.  At the July 7, 2021
Order to Show Cause hearing, Edwards reaffirmed the statements
from his letter that he had not hired Thomas and had not known
that Thomas had filed this Complaint in his name:

> THE COURT:  The action pending before me was brought in
> June of 2019 seeking $145 million from Wells Fargo Bank on
> your behalf and Mr. Minney.
>
> MR. EDWARDS:  Unbelievable.
>
> THE COURT:  Did you file -- did you authorize Mr. Thomas to
> bring such an action?
>
> MR. EDWARDS:  I didn't even know Mr. Thomas.
>
> THE COURT:  Have you ever met Mr. Thomas before today?
>
> MR. EDWARDS:  Never before in my life.  One time he called
> me after I wrote you that letter [to the Court], and I just
> asked him why are you calling me?  Please don't call me
> again.  The letter was in the mail.  That's the first time.
> No, sir.
>
> THE COURT:  You never executed a retainer agreement of any
> kind with him?
>
> MR. EDWARDS:  No, sir.
>
> THE COURT:  Never sought his representation in any matter?
>
> MR. EDWARDS:  No, sir.  I didn't even know this was going
> on.

Id. at 16:24-17:18.

Thomas did not deny these claims or contradict Edwards on
this point.  Instead, Thomas directly and explicitly conceded in
response to questioning from the Court both that "Mr. Edwards

did not hire me," (ECF No. 38 at 23:22-23), and that Thomas had

in fact never met him prior to the hearing:

> THE COURT: You've heard Mr. Edwards indicate that he's
> never retained your services.
>
> MR. THOMAS: That's correct, your Honor.
>
> THE COURT: Have you ever met him before?
>
> MR. THOMAS: No, your Honor."

Id. 23:1-2.

Thomas similarly did not dispute Edwards' claim that they

had never spoken through any other means prior to the filing of

the Complaint in this action.  See id. at 28:15-22 ("THE COURT:

. . . do you contest anything that Mr. Edwards said to me?  MR.

THOMAS: The only thing that I have -- frankly, no.")

It should go without saying that an attorney cannot have

engaged in an "inquiry reasonable under the circumstances" into

the facts underlying a complaint if he has never met nor spoken

to the individual plaintiff on whose behalf he is making those

factual assertions.  But it is not merely conjecture to say that

Thomas did not engage in a reasonably inquiry or show due

diligence in researching the factual allegations of the

Complaint: Thomas did not simply negligently move forward with a

lawsuit on behalf of a plaintiff who had not hired him, but

instead actively asserted a series of factual allegations in

Edwards's name that appear to have been plainly false.

At the July 7, 2021 Order to Show Cause hearing, Edwards repeatedly and consistently told the Court that he had no knowledge of the original foreclosure action at the time it occurred.  See id. at 16:4-16 ("THE COURT: So, you're not aware that a foreclosure action was brought against you in Burlington County Court by the bank? MR. EDWARDS: No, sir. I never stood in front of any judge for anything . . . THE COURT:  Did you retain a lawyer to represent your interest in the foreclosure action? MR. EDWARDS:  No, sir.  I never knew I had to.  I never knew I was in foreclosure in the beginning while this was going on.").

More importantly, Edwards explained to the Court that he had not in fact attempted to renegotiate his mortgage with Wells Fargo, despite his alleged attempts to do so having been described in detail in the Complaint.  See id. at 16:17-23 ("THE COURT:  Did you ever attempt to negotiate a remodification of your loan with Wells Fargo? MR. EDWARDS: No, sir.  THE COURT: You didn't claim an inability to pay the mortgage and seek to have the bank renegotiate the loan so that you could stay in the house and make the payments?  MR. EDWARDS:  No, sir.").

In fact, the Court directly asked Edwards during that hearing whether he had ever engaged in the conduct alleged in a series of specific factual claims in paragraphs 32-37 of the Complaint, (ECF No. 1 at 32-39), alleging that Edwards had taken certain actions to renegotiate or modify his mortgage.  Edwards

19

clearly and repeatedly stated that he had never taken such

actions:

> THE COURT: [] So, for the duration of the year 2015 and
> through the first and third quarters of 2016, did you
> engage in good faith efforts to procure a modification of
> the Wells Fargo loan by submitting documentation to Wells
> Fargo?
>
> MR. EDWARDS: I never did anything like that, sir, no, sir.
>
> THE COURT: Specifically, on December 6, 2016, did you
> continue good faith efforts to procure a modification of
> the FHA insured loan for that property?
>
> MR. EDWARDS: No, sir. I never even heard of any of this.
>
> THE COURT: On March 15th, 2017, did you continue efforts
> with Wells Fargo to modify the loan?
>
> MR. EDWARDS: No, sir.
>
> THE COURT: Did you do so on April 12th, 2017?
>
> MR. EDWARDS: Oh, my God. No, sir.

(ECF No. 38 at 21:4-20).

Thomas attempted to defend his failure to discuss these

allegations with Edwards prior to filing the Complaint by

claiming that he had "reviewed several facts and several

documents that were actually forwarded to me from Mr. Barksdale

and from Mr. Minney prior to that time." Id. at 30:24-31:1.

But even if talking to other individuals besides the named

plaintiff about steps allegedly taken exclusively by that named

plaintiff could have been sufficient under other circumstances,

the fact that those allegations were apparently entirely false

makes clear that whatever "inquiry" Thomas claims to have made here, it was not reasonable and did not give him a sufficient basis under Rule 11 to have filed this Complaint.  And while based on the record before it the Court believes that many of the factual allegations in the Complaint regarding actions allegedly taken by Anthony Edwards were in fact false, it should be noted that even if some of the factual allegations were in fact not false, it would have been impossible for Thomas to be sure of that since he had never once spoken with Edwards himself.

Stated most succinctly, Joshua Thomas filed a seventy-five-page, nineteen-count Complaint, seeking $145 million in damages from multiple defendants and an order overruling a state court's final judgment, without having ever spoken to one of the two named plaintiffs and based in large part on a series of plainly false factual allegations related to the actions of the plaintiff he had never met.  The Court easily finds that such actions violated Rule 11(b)(3).

And the Court further has no difficulty finding that those actions further violated Rule 11(b)(1): simply put, the Court is unable to conceive any proper basis Thomas could have had for filing this Complaint.  Instead, it appears obvious that Thomas had a patently improper purpose for pursuing this lawsuit: to delay or avoid Minney's ejectment from the property under the

state chancery court's orders by filing a preemptive lawsuit
that was necessarily frivolous because it relied upon false
factual allegations and sought relief this Court was almost
certainly barred from providing all for Thomas' financial gain.

This conclusion is only further warranted by Thomas'
history of previously doing just that.  The Court was recently
faced with a separate case in which Thomas brought similar
claims also seeking to help another plaintiff avoid eviction,
Keyes v. Nationstar Mortgage, LLC, No. 1:20-cv-02649, 2020 WL
6111036 (D.N.J. Oct. 16, 2020).  There,  the Court noted both
that as far as it could tell Thomas' "only intention" in using
the litigation tactics he employed there "was to further prolong
this action and to force the Defendants to incur additional
legal costs in defending it," Keyes, 2020 WL 6111036, at *9, and
that Thomas had apparently gone forum shopping in an attempt to
find a court that might possibly help his client unlawfully
avoid eviction:

> The Court has little doubt as to why Mr. Thomas
> chose to file [this lawsuit in the state superior
> court, prior to it being removed to federal court].
> At that point in time, the chancery court had
> already rejected Plaintiff's arguments just two
> months earlier, and he was presumably aware that
> the bankruptcy court had ordered that she would
> receive no further automatic stays. As Defendants
> have noted, Judge Kugler had also previously
> entered an order enjoining Mr. Thomas from "filing
> any further complaint, lawsuit, or petition, which
> pertains to or references any prior foreclosure
> action, in the United States District Court for the

22

> District of New Jersey, without prior authorization
> of the Court." <u>Hood v. Victoria Crossing Townhouse
> Ass'n, et al.</u>, Civil Action No. 18-12259, at ECF
> No. 35.  Accordingly, it appears that Mr. Thomas
> chose the only remaining court that might permit
> him and Plaintiff to bring their action to try and
> avoid eviction.

<u>Id</u>. at 12.

The Court, faced with this troubling history and with
Thomas' decision to pursue this lawsuit without having ever
spoken with Edwards, is forced to conclude that he filed the
Complaint in this action for the patently improper purposes of
harassing the defendants, tying up the property in question for
an indefinite period of time by asserting claims and factual
allegations for which he had no support, and needlessly delaying
any resolution of the question of who properly owned the
property at the center of this dispute.

In his defense, Thomas has now filed two separate written
responses to the Court's Orders to Show Cause.  The Court first
briefly notes here that Thomas' second written defense of his
actions, filed on September 3, 2021, in response to the Court's
second Order to Show Cause, is nearly entirely identical to his
first written response.  <u>Compare</u> (ECF Nos. 8, 37).  At the July
7, 2021 Order to Show Cause hearing, the Court made it entirely
clear that it did not view Thomas' first response as having
sufficiently demonstrated that his actions were not
sanctionable.  (ECF No. 29).

23

Rather than draft a new document attempting to truly answer this Court's questions and defend his conduct, Thomas instead copied-and-pasted nearly the entirety of the first filing into the second response, added a few things, and changed the formatting from numbered list to a series of paragraphs. This is, of course, ironic as that cutting and pasting baseless assertions is how Thomas prepares his pleadings as described in more detail below. The main substantive additions were new citations to emails related to the apparent dispute regarding Minney's attempt to purchase the house — which is entirely irrelevant to the questions before the Court today — as well as citations to transcripts of two hearings held in the second chancery court action and a brief discussion of Thomas' assertion that Minney had informed him via email that Edwards approved of the filing of this lawsuit. (ECF No. 37).

Thomas, in his two written responses and at the July 7, 2021 Order to Show Cause hearing, has put forward essentially four arguments in his defense: (1) that he has never claimed to represent Anthony Edwards; (2) that Edwards had to be included in this lawsuit under New Jersey's entire controversy doctrine; (3) that Marvin Minney, Jr. had actually told Thomas via email that Edwards approved of the lawsuit and (4) that Judge Fiamingo told him in one of the underlying state court actions that Edwards had to remain a party. But Thomas' arguments fail to

explain or excuse his actions here in any way; in fact, his explanations themselves appear to constitute further violations of the Rules of Professional Conduct.  Accordingly, the Court will briefly address each of Thomas' arguments in turn.

In his response to the Court's first Order to Show Cause, Thomas flatly asserts that "at no time in either" of the state chancery court actions did he "claim to represent Mr. Edwards." (ECF No. 8 at 3, ¶ 27).[5]  He further certified that "at the time [he] got involved with" the first foreclosure action, he "made it very clear to the court, that [he] was only representing the interests of Marvin Minney (who has since deceased) and that Mr. Edwards was improperly included in this case, as he had no interest in the property."  Id. at ¶ 21.  He also told the Court that, in the ejectment action, it "was made clear to the Court in a very contested manner that" he "only represented Mr. Minney."  Id at ¶¶ 25-26.  As Thomas' second written response is largely copied-and-pasted from his first response, it again reasserts each of these claims.  (ECF No. 37 at 2-4).

The Court first notes that it simply cannot fathom how Thomas believes that filing a Complaint in the name of Anthony

---

[5] For clarity of the record, the Court notes that Thomas submitted a response to the January 29, 2020 Order to Show Cause on February 13, 2020 (ECF No. 8), and subsequently provided supplementary materials to support his February 13, 2020 filing, including a transcript and other papers, on May 18, 2020 (ECF No. 15).

Edwards, which affirmatively references Anthony Edwards as a plaintiff throughout, does not qualify as a claim that he represents Anthony Edwards.  But even more straightforwardly, even the most cursory review of the state court dockets and the transcripts Thomas himself has filed in his own defense shows that each of the assertions above appear to be demonstrably false for two reasons.

First, Thomas simply lied in his response to the first Order to Show Cause when he stated that he had never claimed to represent Edwards and that he had actually informed the state chancery court in the second ejectment action that he only represented Minney, and he repeated this lie at the July 7, 2021 Order to Show Cause hearing.  (See ECF No. 38 at 27:22-28:1l).  In fact, Thomas entered a notice of appearance in the second state court action that affirmatively declared that "I, the undersigned attorney, hereby enter my appearance as counsel on behalf of Anthony Edwards and Marvin Minney."  GBG Properties LLC, Case No. Bur-DC-5350-19 at Docket No. 20191760704.  While Thomas claims that this was a simple error that was resolved with Judge Fiamingo, the Court will address in greater detail in its later analysis of Thomas' violations of the Rules of Professional Conduct why this claim appears to simply be yet another blatant lie.

Second, Thomas has not only failed to offer any evidence

that he actually told Judge Fiamingo when he first got involved
in the initial foreclosure action that he was not representing
Edwards, but it is clear from the docket in that case that the
court there itself did not believe that any such representation
had occurred.  That docket shows that there was only one hearing
after Thomas became involved, where the Court presumably heard
oral argument on his motion to set aside the sheriff's sale on
April 12, 2019.  That same day, Judge Fiamingo issued an opinion
and order denying the motion, which stated that "Counsel does
not identify his client by name, nor has he filed any
appearance.  Thus, [the Court] does not know if counsel
represents defendant, Anthony Edwards, or one or both of the
transferees."  Wells Fargo Bank, NA, Case No. F-032559-16,
Docket No. 2019161523 at 2-3.

The Court understands that it is technically possible that
Thomas, at some point not clearly noticeable on the state court
dockets, had a conversation with Judge Fiamingo in which he
clarified who he represented.  But while Thomas provided
citations to exhibits throughout his second written response
that he claims support his assertions, the sentence "At the time
I got involved with the case, I made it very clear to the court,
that I was only representing the interests of Marvin Minney . .
. and that Mr. Edwards was improperly included in this case" is
supported by no citations or evidence whatsoever, despite the

fact that Thomas has had nearly two months to prepare his second
response and received multiple extensions to order, receive, and
review transcripts of all of the state court hearings.  See (ECF
Nos. 30, 31, 32, 33, 34, 36, 37).

More importantly, the evidence before the Court as of this
date, rather than bolstering this claim, all heavily supports
this Court's suspicion that Thomas is being dishonest once again
in an attempt to avoid sanctions for his previous falsehoods.
Joshua Thomas simply does not have any remaining credibility
with this Court or likely almost any other court that he has
litigated before in recent years and has long since forfeited
the right to be taken at his word or given the presumption of
truthfulness that this Court would generally grant the lawyers
appearing before it.  As the Court will discuss in greater
detail below in its discussion of Thomas' violations of the
Rules of Professional Conduct, Thomas has not only repeatedly
lied to this Court, but in fact has an extended history of
directly lying to other courts in this Circuit.  See, e.g.,
Taggart v. Deutsche Bank National Trust Co., No. 20-5503, 2021
WL 2255875, at *12 (E.D. Pa. June 3, 2021) ("Joshua Thomas lied,
repeatedly, to the Court at oral argument on Defendants' Motions
to Dismiss."); Jacovetti Law, P.C. v. Shelton, No. 20-00163,
2020 WL 1491320, at *1 (E.D. Pa. March 27, 2020) (finding that
Thomas "lied to the Court . . . on the record and under oath");

In re Thomas, 612 B.R. 46, 65 (Bankr. E.D. Pa. 2020) (finding
Thomas's explanations for his actions in a separate case
"completely incredible" and stated explicitly that "Simply put,
I do not believe Thomas' testimony").  Given this extensive
history of dishonesty and his actions in this current case,
Thomas long ago forfeited the benefit of the doubt and the
undisputed evidence shows him lying once again.

Thomas' second argument for why he should not be sanctioned
is that Anthony Edwards had to be included in this lawsuit under
New Jersey's entire controversy doctrine, a point he repeatedly
noted both in his first response and at the July 7, 2021 Order
to Show Cause hearing.  See (ECF No. 8 at 3, ¶ 28; ECF No. 38 at
23:23-24:5, 27:23-24).  Frankly, this explanation makes such
little sense that the Court is again forced to assume that
Thomas is knowingly presenting incorrect and unsupported
arguments in a last-ditch effort to avoid sanctions.

As this Court explained to Thomas in the Keyes case in
which he appeared and raised similar claims just last October,
"New Jersey's entire controversy doctrine 'embodies the
principle that the adjudication of a legal controversy should
occur in one litigation in only one court; accordingly, all
parties involved in a litigation should at the very least
present in that proceeding all of their claims and defenses that
are related to the underlying controversy.'"  Keyes, 2020 WL

29

6111036, at *7 (quoting Shibles v. Bank of America, N.A., 730 F. App'x. 103, 106 (3d Cir. 2018)).  The doctrine "applies in federal courts when there was a previous state-court action involving the same transaction," Ricketti v. Barry, 775 F.3d 611, 613 (3d Cir. 2015), and simply requires "claims that [are] germane to [a] foreclosure proceeding" to be brought in that foreclosure proceeding.  Delacruz v. Alfieri, 447 N.J. Super. 1, 145 A.3d 695, 701 (N.J. Super. Ct. Law Div. 2015).

Were it some other attorney before the Court in this action, it might be fair to assume that they had simply demonstrated a worrisome, but not necessarily unethical, failure to understand an important and relatively straightforward doctrine of New Jersey law.  But the lawyer that stood before the Court on July 7, 2021 was Joshua Thomas, and Joshua Thomas cannot with a straight face claim that when he walked into the courtroom that day, he was so ignorant of the entire controversy doctrine that he thought it was a reasonable and valid explanation for why his actions in this case were not sanctionable.

As noted above, this Court had just walked through the specific contours of the entire controversy doctrine only a few months prior in dismissing all of the claims he had asserted in a separate lawsuit on behalf of a different client who was also trying to set aside a foreclosure and sheriff's sale of a home

30

where she lived.  In fact, this Court sanctioned Thomas in that
action for having pursued those claims by putting forward
"repeatedly frivolous and unmeritorious arguments" against
dismissal under the entire controversy doctrine and other
similar doctrines.  Keyes, 2020 WL 6111036, at *12.

Nor is this the only such recent case in which this has
happened: in a June 2019 Opinion, Judge Kugler, faced with a
lawsuit much like this one and Keyes, pointed out that Thomas
"has a well-documented history of filing virtually identical
claims in the foreclosure context barred by either the Rooker-
Feldman doctrine or the New Jersey entire controversy doctrine
or both in the District of New Jersey and the Eastern District
of Pennsylvania."  Hood v. Victoria Crossing Townhouse
Association, No. 18-12259, 2019 WL 3336132, at *3 (D.N.J. July
25, 2019).  In that case, Judge Kugler provided six examples of
previous cases, dating back only to July 10, 2017, in which
courts had dismissed claims pursued by Mr. Thomas under the
entire controversy doctrine.  Id. at *3 n.5.  Judge Kugler then
proceeded to dismiss the claims in that case under the entire
controversy doctrine and provided a clear and straightforward
explanation of how the doctrine works, id. at 6-7, and
ultimately entered a preclusion Order enjoining Mr. Thomas from
"filing any further complaint, lawsuit, or petition, which
pertains to or references any prior foreclosure action, in the

31

United States District Court for the District of New Jersey, without prior authorization of the Court." Hood, No. 18-12259 at (ECF No. 35).

Accordingly, in just the four years preceding the July 7, 2021 Order to Show Cause hearing, Thomas had received several detailed explanations of the contours of the entire controversy doctrine from courts in at least eight separate cases. It is simply not possible that he truly believed at the Order to Show Cause hearing on July 7, 20221 that the entire controversy doctrine excused his decision to file a complaint on behalf of someone he had never met and had not been retained by. In no possible way can that doctrine be read to grant an attorney the right to file a lawsuit on behalf of an individual he has never met or spoken to. In fact, as far as the Court can tell, the correct application of the entire controversy doctrine in this action would almost certainly be to bar some or all of the claims Thomas put forward in the Complaint.[6]

---

[6] The Court did not previously give Thomas notice that he may be sanctioned for filing a Complaint filled with claims that were not "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law" under Rule 11(b)(2), and therefore will not spend time analyzing whether he further deserves sanctions under that provision as well. However, in an attempt to fully outline the extent of Thomas' misconduct in this case, the Court briefly notes that its review of the Complaint suggests that the claims here, much like the claims in Keyes, Hood, and many other lawsuits he has filed, are likely barred under the entire controversy doctrine and other related doctrines in a way that

Thomas' third argument for why he should not be sanctioned
is that he had been given authority to file this action in
Edwards' name.  In support of this claim, Thomas' second written
response provides two types of evidence.  See (ECF No. 37).
First, he attaches and cites to multiple emails from other
individuals, mostly Barksdale and Minney, in which they
reference Edwards, as well as a letter that appears to be
related to the sale of the home that is addressed to Edwards.
But while these documents could possibly, if viewed in a light
particularly favorable to Thomas, suggest that Edwards was more
involved in the underlying mortgage and property-sale issues
than he claimed at the July 7, 2021 Order to Show Cause hearing,
they certainly do not provide any basis for Thomas to have filed
a lawsuit in Edwards' name.  Conspicuously, despite having
provided the Court with a number of emails and communications
that appear entirely irrelevant to the pressing question before
it, Thomas does not attach any communications he ever had with
Edwards himself — because, of course, Thomas has admitted that
he never spoke to him before filing the Complaint.

Thomas also attaches to his second written response an
email from Minney, forwarded to Thomas by Barksdale, which he
referenced at the July 7, 2021 hearing.  That email references

should have been clear to Thomas before he filed the Complaint.

this lawsuit, and says "Why is everything still in Tone Edwards name?  They are still serving him rather than me.  I explained the lawsuit to Tone and got him on board with Josh and  If he can get paid too that is fine with me."  (ECF No. 37 at 3) (typos in original).  Thomas claims that this email shows that Edwards was aware of the lawsuit and involved, and that "[t]here was never any indication, that Mr. Edwards was not cooperating with the whole process, nor that he objected in any way, until his letter to the court."  Id. at 4.

But as the Court explained to Thomas at the July 7, 2021 Order to Show Cause hearing, this email is entirely insufficient to demonstrate that he had authorization to file this lawsuit. Even assuming that this email, presented third-hand to the Court, asserts true facts, any ethical or remotely competent attorney would know that being forwarded an email which states that an individual he has never met is "on board" with a lawsuit does not constitute a retainer agreement or the hiring of that attorney and does not qualify as authorization to file a lawsuit on that individual's behalf.

Nor does the Court believe that Thomas truly believes this argument, given the fact that he openly and readily conceded at the July 7, 2021 Order to Show Cause hearing that "Mr. Edwards did not hire me."  (ECF No. 38 at 23:22-23).  The Court firmly rejected his arguments based on this email at the hearing and is

34

genuinely surprised that Thomas would continue to assert that this email alone somehow gave him permission to take the actions he took in filing this lawsuit.

Finally, Thomas argued in both of his written responses and at the July 7, 2021 Order to Show Cause hearing that in the foreclosure action Judge Fiamingo "made clear that Mr. Edwards was to stay on as a defendant during that proceeding," (ECF No. 8 at 3, ¶ 23; ECF No. 37 at 3) and therefore he believed that Edwards had to be included as a plaintiff in this action "because he frankly needed to be because he was a party in interest in the foreclosure action." (ECF No. 38 at 25:11-15). There are two issues with this argument. First, Thomas has, of course, once again failed to put forward any evidence that this ever happened, and the Court already explained above that he has long since forfeited the right to be taken at his word.

Second, even if Thomas is telling the truth, the Court pointed out in the July 7, 2021 Order to Show Cause hearing that even though a "judge happen[ed] to opine that the person who is the mortgagor must remain a party in a foreclosure action," a rather simple and straightforward concept, that does not grant an attorney the legal right to simply add that person as a plaintiff in a separate lawsuit without having been retained by him. Id. at 26:13-23. Even if Thomas is correct that Anthony Edwards had to be involved in this lawsuit in order for the

35

individual who did hire him, Marvin Minney, Jr., to pursue the
claims asserted in the Complaint, that simply does not mean that
Thomas was permitted to do what he did here.

Instead, any remotely competent and honest attorney would
understand that such a legal requirement would mean that if the
attorney intended to pursue such claims for Minney, the attorney
would need to first speak with Edwards, address any conflicts,
and if no conflict existed or was waivable and waived, be
retained as his counsel so that he could give the attorney
actual authorization to file a lawsuit on his behalf.  Thomas'
apparent belief that he did not need to do so here only further
underscores the extent to which Thomas has repeatedly failed to
properly assess, understand, or care about his legal and ethical
duties as a practicing lawyer.

At the July 7, 2021 hearing, the Court repeatedly asked
Thomas an extremely simple question: "What legal principle, rule
of law, ethics rule, contractual principle, allows you to enter
an appearance on someone's behalf that you have never met, never
spoken to, haven't determined conflict of interest, or have any
basis to assert claims on their behalf?"  Id. at 27:15-19.
Thomas was unable to provide an answer at the hearing, and he
has not provided an acceptable one in his written responses.
The Court will therefore sanctions Thomas for violating Rules
11(b)(1) and (3) through the misconduct described above.

Under Rule 11, "[t]he court has available a variety of possible sanctions to impose for violations, such as striking the offending paper; issuing an admonition, reprimand, or censure; requiring participation in seminars or other education programs; ordering a fine payable to the court; [and] referring the matter to disciplinary authorities." Fed. R. Civ. P. 11 Advisory Committee Notes (1993 Amendment); see also Snow Machines, Inc. v. Hedco, Inc., 838 F.2d 718, 725 (3d Cir. 1988) (approving imposition of sanctions payable to district court rather than opposing party "deterrence of improper behavior, not simply compensation of the adversary, is a goal of Rule 11"). The Court specifically warned Thomas at the July 7, 2021 Order to Show Cause hearing that it intended to impose monetary sanctions, and the Court will do so in this Opinion and accompanying Order. Thomas will be assessed a Rule 11 sanction in the amount of $5,000.00, payable to the Court in 30 days.


C. Joshua Thomas Violated the Rules of Professional Conduct

The Court next looks to the Rules of Professional Conduct ("RPC") to assess whether Thomas has violated additional ethical duties imposed on him as an attorney. Local Civil Rule 103.1(a) explains that "[t]he Rules of Professional Conduct of the American Bar Association as revised by the New Jersey Supreme Court shall govern the conduct of the members of the bar

37

admitted to practice in this Court." Further, Local Civil Rule 104.1(e)(1) provides that "[e]very attorney authorized to practice law or appearing before this Court . . . shall be subject to the disciplinary jurisdiction of this Court," and Rule 104.1(e)(2) specifically requires that "[w]hen misconduct or allegations of misconduct which, if substantiated, would warrant discipline of an attorney, shall come to the attention of a Judge of this Court, and the applicable procedure is not otherwise mandated by these Rules, that Judge shall refer the matter in writing to the Chief Judge."

The Court's analysis here is therefore not intended as a final ruling regarding whether Thomas violated individual ethical duties under the RPC and will not result in any additional sanction imposed by this Court in this action. Instead, the Court simply analyzes whether Thomas appears to have violated individual Rules of Professional Conduct such that his referral to the Chief Judge and the attorney ethics body of New Jersey for further disciplinary proceedings is necessary.

The Court will start with Thomas' most straightforward ethical violations. RPC 3.1 provides that "[a] lawyer shall not bring or defend a proceeding, nor assert or controvert an issue therein unless the lawyer knows or reasonably believes that there is a basis in law and fact for doing so that is not frivolous[.]" Here, as set forth in detail above, there is

38

simply no question that Thomas filed this lawsuit without having ever met or spoken with Anthony Edwards, a named plaintiff in the Complaint and the subject of a significant number of the factual allegations included throughout.  Thomas therefore filed the Complaint while knowing, or being in a position where he certainly should have known, that he had no factual basis for doing so that was not frivolous.

As the Court explained above, no ethical lawyer could possibly believe he had a reasonable basis for asserting claims on behalf of an individual he had never met, spoken to, or been retained by.  Thomas went even further and affirmatively asserted factual allegations that Edwards himself has stated were plainly false.  The Court has difficulty imagining a simpler example of a violation of RPC 3.1.

However, the Court also believes it necessary to note that Thomas' violations of RPC 3.1 do not merely cover the lack of a reasonable factual basis for the claims he has asserted, nor do they appear to be limited to simply the case currently before this Court.  Instead, review of Thomas' history as an attorney practicing before the federal courts of this Circuit shows that he has consistently and doggedly filed lawsuits and pursued claims that any competent or ethical attorney would know were barred and had no basis in law.  And these lawsuits and claims have nearly all occurred in the same context of mortgage

disputes and attempts to avoid foreclosure and eviction, meaning that he has repeatedly run afoul of the exact same legal doctrines time and again.

As the Court referenced above, Thomas has consistently pursued claims that were clearly and unquestionably barred by the entire controversy doctrine, the Rooker-Feldman doctrine, and more.  The Court can point to at least fourteen such cases prior to this one in just the last four years, as Judge Kugler listed twelve examples since 2017 in dismissing the claims before him for the same reasons in Hood, 2019 WL 3336132, at *3, and this Court itself just dismissed a remarkably similar, separate case filed by Thomas under the exact same legal doctrines in October 2020 and sanctioned him in part for filing and pursuing those claims.  Keyes, 2020 WL 6111036 at *12.  While the Court does not have adversary briefing before it today to allow it to fully assess the merits of this case, it appears to be an almost certainty that some or all of the claims that Thomas asserted here are barred under the exact same doctrines as the claims in those other cases.

Joshua Thomas has firmly proven that he either does not care what the law is, or what statutes or courts say, and that he has no hestitation filing lawsuits that have no reasonable basis in law purely for the purpose of tying up disputes and defendants in court while attorneys and judges devote years to

trying to untangle the messes he has made.  The Court simply does not believe, after all this time and after this many cases, that Thomas remains unaware of the legal doctrines governing the area of law in which he has apparently chosen to focus his practice; instead, it seems abundantly clear at this time that his actions are intentional and that the resulting legal delays and substantial costs imposed upon his adversaries are not simply a byproduct of a litigation process intended to reach the proper adjudication of a true legal dispute, but instead are the actual end goals he is pursuing when he files new actions.  The Court therefore believes that Thomas has violated RPC 3.1 on numerous occasions.

But Thomas has not merely pursued frivolous claims without factual or legal bases; he has also repeatedly shown a disturbing willingness to lie when confronted with his own misconduct and shortcomings.  RPC 3.3(a)(1) provides that "[a] lawyer shall not knowingly . . . make a false statement of material fact or law to a tribunal."  Thomas not only violated that rule in this case in the first place, but then attempted to cover up his initial false statement with additional lies.

As the Court discussed above in its Rule 11 analysis, Thomas responded to the Court's initial Order to Show Cause in this case by filing a response that unequivocally stated that that "at no time in either" of the state chancery court actions

did he "claim to represent Mr. Edwards." (ECF No. 8 at 3, ¶ 27). But just a quick glance at the docket in the ejectment action before Judge Fiamingo revealed that on July 31, 2019, he filed a Notice of Appearance in that action stating that "I, the undersigned attorney, hereby enter my appearance as counsel on behalf of Anthony Edwards and Marvin Minney." GBG Properties LLC, Case No. Bur-DC-5350-19 at Docket No. 20191760704. Thomas then proceeded to reassert at the July 7, 2021 Order to Show Cause hearing, after the Court specifically asked him about this filing, that the notice of appearance was only "entered on behalf of Mr. Minney." (ECF No. 38 at 27:22-25).

It was only after the Court confronted him with a copy of the notice and had him read it into the record that Thomas conceded that he had entered an appearance on behalf of Edwards and claimed that "it was an error and it was only supposed to be for Mr. Minney. The Court accepted that and we proceeded." Id. at 28:12-14. This Court accepted Thomas' explanation at that hearing, assuming he would not have lied so directly and with such little hesitation regarding a material fact that was at the core of the Court's purpose in holding the Order to Show Cause hearing.

The Court, unfortunately, was wrong. Thomas filed the notice of appearance in GBG Properties LLC on July 31, 2019. The docket for that case shows no filings by Thomas correcting

that apparent error, and that the chancery court held two hearings after July 31, 2019 at which Thomas could have made this correction in person to Judge Fiamingo: one on August 23, 2019, and one on September 12, 2019.  Thomas, in his post-hearing written response, asserted once more that the fact that he "[o]nly represented Mr. Minney . . . was made clear again to the Court in a very contested matter and even corrected at the second hearing."  (ECF No. 37 at 4).  Thomas himself has provided the Court with the transcripts from those two hearings.  And, in what should truly come as no surprise at this stage, the transcripts reveal that at no point in either hearing did Thomas inform Judge Fiamingo that the claim on the notice of appearance that he was representing Anthony Edwards was an error, and at no point did Judge Fiamingo "accept" that correction.

In his post-hearing filing, Thomas points the Court to the follow exchange from the transcript of the September 12, 2019 state court hearing as the exact point where he "made clear again to the Court" that he did not represent Anthony Edwards:

> THE COURT:  No.  This says directing the sheriff to subsequently remove the defendant is an enforcement mechanism.  The order said -- the order said that your client was -- whoever your client is, it was –
>
> MR. THOMAS:  It's Mr. Edwards, Your Honor.
>
> THE COURT:  Mr. Edwards doesn't live there.
>
> MR. THOMAS:  Yes, Your Honor.  I'm sorry, excuse me, Mr. Minney.  Mr. Minney, Your Honor.

43

(ECF No. 37-1 at 83, N.J. Ch. Sept. 12 Transcript at 7:5-13).

But this ambiguous exchange concerning occupancy of the subject

property clearly does not, in any way, support Thomas' assertion

at the July 7, 2021 Order to Show Cause hearing or the assertion

it is cited for in his second response.

At the July 7, 2021 Order to Show Cause hearing, Thomas was

specifically asked by this Court about the notice of appearance

he filed on behalf of Anthony Edwards, and unequivocally claimed

that he had informed Judge Fiamingo that the notice of

appearance was a mistake and that she had accepted his error.

(ECF No. 38 at 28:12-14).  Then, in his second Order to Show

Cause response, Thomas asserted again that he had made clear

that he only represented Minney, not Edwards.  But the

transcripts clearly show not only that the notice of appearance

was never once referenced in either hearing, but also that at

one point in the second hearing Thomas actually referred to

Edwards as his client before being corrected by Judge Fiamingo

that she was asking him about Minney instead.  The context of

the above-quoted exchange and surrounding conversations taking

place in that state court hearing, shown by even a brief review

of the transcript, makes it entirely clear that the discussion

there only involved who was living in the home at La Clede Drive

at that point in time and therefore was being forced to vacate

the property — not whether Thomas had been hired by Anthony Edwards to represent him.  And at no other point in either transcript does the Court or Thomas address the question of whether Thomas was representing Edwards or had been retained by him as counsel.

The Court has little difficulty finding that his statements in both his written response to the initial Order to Show Cause and at the July 7, 2021 Order to Show Cause hearing likely constitute violations of RPC 3.3.  Thomas lied to the Court in his initial written filing by stating that he had never claimed to represent Edwards in either of the state chancery court actions, lied again at oral argument in response to a direct question from the Court regarding whether he had in fact entered an appearance on behalf of Edwards without having been retained by him, and then reasserted the exact same lie in his second written response while citing to a section of a transcript that clearly did not support the claims he had made.

The only question then is whether Thomas made his false statements regarding a "material fact."  It appears to this Court that he did.  "[T]he scope and application of subsection (a)(1) ... relate[s] to a false statement of fact that is directly relevant to the particular litigation, either a fact in issue or a fact relating to a matter of procedure or the progress of the matter."  In re Press, No. 11-86, 2015 WL

45

12911714, at *7 (D.N.J. Feb. 4, 2015) (quoting Brundage v. Estate of Carambio, 195 N.J. 575, 592 (2008)).  Here, whether Thomas had ever claimed to represent Anthony Edwards or entered an appearance on his behalf was not only the central question the Court sought to have answered at the July 7, 2021 Show Cause hearing, it was also directly relevant to this litigation and the progress of this matter given the pressing question of whether Thomas filed the Complaint in this action without Edwards' knowledge or authorization.

Such casual dishonesty is not new for Joshua Thomas. Instead, as the Court referenced above in its Rule 11 analysis, he has repeatedly shown a disturbing willingness to lie to courts in response to direct, specific, pressing questions about his own conduct.  Since the Court is writing not only for itself and the parties here, but also for the benefit of any other disciplinary bodies that may review Thomas' conduct, the Court finds a brief description of a few recent examples of Thomas' history of false representations to be warranted.

First, in March of 2020, Judge Wolson of the Eastern District of Pennsylvania found that Thomas had repeatedly "disregarded the rules and deadlines that ensure cases move in an orderly way."  Jacovetti Law, 2020 WL 1491320 at *1.  When Judge Wolson questioned Thomas about this conduct at an Order to Show Cause hearing, Thomas "lied to the Court about the reasons

for his actions on the record and under oath." Id.  Similarly, only a month prior Judge Frank of the Bankruptcy Court for the Eastern District of Pennsylvania had found Thomas' explanations for his actions in a separate case "completely incredible" and stated explicitly that "[s]imply put, I do not believe Thomas' testimony . . . ." In re Thomas, 612 B.R. at 65.

And more recently, Thomas showed an even greater willingness to lie about one of the most important questions a lawyer can be asked.  In a case before Judge Pappert of the Eastern District of Pennsylvania, defense counsel alerted the court that the Disciplinary Board of the Commonwealth of Pennsylvania had apparently administratively suspended Thomas' bar license only a few days before oral argument on a pending motion to dismiss due to his failure to complete his annual CLE requirements.  Taggart, 2021 WL 2255875 at *12.  When Judge Pappert questioned Thomas about this at the hearing, he repeatedly "assured the Court that he had resolved the issue by completing and submitting the required CLE documents earlier that week."  Id.  Based on those representations, Judge Pappert allowed Thomas to represent his client at oral argument that day.  Id.

However, after the hearing, the court "contacted the Office of Disciplinary Counsel to inquire into the status and circumstances of Thomas's administrative suspension," only to be

informed that the Office "had no knowledge of Thomas submitting any required documentation before the oral argument" on April 22 and Thomas had in fact "satisfied his requirements on April 27, five days *after* the argument." Id. Judge Pappert therefore held that "Joshua Thomas lied, repeatedly, to the Court at oral argument on Defendants' Motions to Dismiss." Id. Faced with such direct dishonesty, Judge Pappert specifically found that Thomas had "violated his duty of candor" under RPC 3.3. Id. at *13.

But that is of course not the end of Thomas' potential ethical violations. The misconduct above further spills over into the territory of RPC 1.1, which provides that "[a] lawyer shall not . . . [h]andle or neglect a matter entrusted to the lawyer in such manner that the lawyer's conduct constitutes gross negligence[, or] [e]xhibit a pattern of negligence or neglect in the lawyer's handling of legal matters generally." The Court will first briefly note that while Thomas was not retained by Anthony Edwards, nobody here appears to question whether or not he was in fact hired by Marvin Minney, Jr. to represent his interests in the property in question. Although the Court has been informed that Minney has since passed away and the Complaint has been dismissed, the Court is hard pressed to see how Thomas' handling of this case — namely, including a second plaintiff that he had never met and factual allegations

that were plainly false and failing to serve the Defendants for nearly a year — did not at least come close to exhibiting a pattern of negligence in and of itself.

But even if Thomas was not specifically negligent in his handling of this matter, it cannot be overstated how consistently this Court and other courts in this Circuit have been faced with Thomas' negligence in his handling of nearly every other case he has filed over the past several years.  In Keyes, this Court first sanctioned Thomas not only for his frivolous arguments, but also for repeatedly "failing to file documents by their deadlines [] and failing to oppose dispositive motions."  2020 WL 6111036 at *13.  And Thomas' decision to file a response to the Court's second Order to Show Cause in this action that consisted mostly of copied-and-pasted passages from his response to the first Order to Show Cause was similarly not an isolated incident.  See (ECF Nos. 8, 37).  In Keyes, this Court further sanctioned Thomas for filing a brief that consisted merely of copied-and-pasted passages from an earlier failed brief on two separate occasions, 2021 WL 2651946 at *8, something Thomas had also previously done in a different case this past spring where the Third Circuit sanctioned him for filing an appellate brief that was simply a copied-and-pasted version of a brief he filed before the district court with "Plaintiff" and "Defendant" swapped out for "Appellant" and

49

"Appellee," and then filing yet another "copy-and-paste job" in opposition to a motion for sanctions filed during the appeal itself.  Conboy v. United States Small Business Administration, 992 F.3d 153, 157-58 (3d. Cir. 2021).

These few examples do not come close to encompassing the full universe of Thomas' practice as an attorney before the federal courts, where he has made a pattern of negligence his standard approach to handling his cases and something approaching a litigation strategy.  This Court provided a more detailed outline of some of these cases in which he had been sanctioned or warned of the possibility of future sanctions by other federal courts in this Circuit in its June 28 Opinion in Keyes.  See 2021 WL 2651946 at *10-13 (No. 20- 02649 at 27-38).  As the Court believes this history would be highly relevant to any disciplinary bodies reviewing Thomas' conduct for violations of his ethical duties under the Rules of Professional Conduct, the Court will further include a copy of that Opinion as well in any disciplinary referral it makes.

Finally, the Court turns to the "catch-all" provision of the Rules of Professional Conduct.  Particularly relevant to this case are RPC 8.4(c) and 8.4(d).  RPC 8.4(c) provides that "[i]t is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation," while RPC 8.4(d) similarly forbids a lawyer

50

from "engag[ing] in conduct that is prejudicial to the administration of justice."

The Court sees no need for an extended analysis of why it believes Thomas has violated these rules.  The discussion above lays out in detail Thomas' actions in filing a Complaint filled with false factual allegations on behalf of an individual he had never met or been retained by and repeatedly lying to this Court about his conduct.  It further describes his extensive history of dishonesty to other courts, negligence in the handling of his cases, and consistent attempts to use frivolous claims and the federal court system to harass defendants, needlessly delay resolution of legal disputes, and tie up cases indefinitely. This misconduct has not only repeatedly involved dishonest, deceit, and misrepresentation — if not outright fraud in certain cases — it has unquestionably been extremely prejudicial to the administration of justice in both this Court and the other courts of this Circuit.[7]

---

[7] The Court does not believe it has sufficient information before it to properly assess whether Thomas may also have violated RPC RPC 1.7, which provides that "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest," in filing this lawsuit on behalf of both his client Marvin Minney, Jr. and Anthony Edwards.  However, as the Court pointed out during the July 7, 2021 Order to Show Cause hearing, by failing to ever meet or speak with Edwards before filing the Complaint, he necessarily failed to inquire as to whether "there might [have been] a conflict of interest between Mr. Minney and Mr. Edwards."  (ECF No. 38 at 26:22-23).  While the Court reaches no conclusion itself regarding whether Thomas violated

"The practice of law requires respect for, and adherence to, standards of conduct.  It is compliance with those standards that serve to define what it means to be a member of a profession.  It is the obligation of every attorney to ensure that the public's trust in the judicial process is maintained. It is also the obligation of every judge." Kramer v. Tribe, 156 F.R.D. 96, 110 (D.N.J. 1994).  Joshua Thomas has consistently rejected those standards over the past several years, month-after-month in case-after-case.  A remarkable number of courts in this Circuit have warned or sanctioned Thomas in repeated attempts to force him to reconsider the path he was on and recommit himself to the responsible and ethical practice of law. Those courts and the sanctions they have imposed, and indeed the sanctions imposed by this Court itself, have not been enough. It is the opinion of this Court, reached only after extensive exposure to Thomas' practice as an attorney and serious deliberation on his history and the possibility of success of

---

this rule, it finds it appropriate to note that the record before the Court at this stage shows at the very least that the existence of such a conflict of interest between Edwards, who had purchased the home and taken out a mortgage in his name, and Minney, who was apparently the one living in the home and who had failed to keep up with the monthly payments for a mortgage in Edwards' name, is highly possible and certainly should have prompted an ethical attorney to inquire further into the factual circumstances underlying this case.  And as noted previously, Minney as possible purchaser and Edwards as possible seller is a relationship rife with potential conflicts.

other potential courses of action, that his continued status as a barred attorney serves not only to undermine that vital public trust in our judicial process, but also as an active danger to the potentially unsuspecting clients, defendants, and courts that cross his path.

The Court therefore finds it necessary to refer Joshua Thomas for further disciplinary proceedings as provided for in our local rules.  More specifically, this Opinion outlining Thomas' misconduct in this specific case and providing further color on his history of misconduct in other cases will be forwarded to our Chief Judge for her review and consideration under Local Civil Rule 104.1(e)(2).  Nanavanti v. Cape Regional Medical Center, No. 12-3469, 2013 WL 4787221, at *1 n.1 (D.N.J. Sep. 6, 2013) ("The Court will, therefore, forward a copy of this Opinion to the Chief Judge pursuant to Local Civil Rule 104.1(e)(2) for consideration."); U.S. v. Lore, 26 F. Supp. 2d 729, 732 n.3 (D.N.J. 1998) ("this opinion will be referred to the Chief Judge in accordance with Local Rule 104.1(e)(2)."). And since membership in the bar of this Court is derivative of admission to the state bar of New Jersey, such a referral to the Chief Judge includes, as set forth in Local Civil Rule 104.1(e)(2), whether Thomas should be referred to the New Jersey Office of Attorney Ethics for such investigation and further disciplinary action as may be deemed warranted by that entity.

## CONCLUSION

For the reasons expressed above, Joshua Louis Thomas will be directed to pay $5,000.00 into the registry of the Court within 30 days of this Opinion and accompanying Order as a sanction for his actions in filing this case, and the Court will further refer him to the Chief Judge of this District for further disciplinary action as may be warranted.

An appropriate Order will be entered.[8]


Date: January 5, 2023                    s/ Noel L. Hillman
At Camden, New Jersey            NOEL L. HILLMAN, U.S.D.J.

---

[8] In addition, in light of the findings and conclusions in this Opinion, a separate Order will be entered dismissing this matter with prejudice.